# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3457

_____

Kamal Al-Zubaidy,                         *

                                       *

          Appellant,             *

                                       *   Appeal from the United States

     v.                             *   District Court for the

                                       *   District of Nebraska.

TEK Industries, Inc.; Barbara Unger, in  *

her official and individual capacities,    *

                                       *

          Appellees.             *

_____

Submitted:  December 16, 2004
Filed:  May 11, 2005

_____

Before LOKEN, Chief Judge, MORRIS SHEPPARD ARNOLD and RILEY,
    Circuit Judges.

_____

RILEY, Circuit Judge.

Kamal Al-Zubaidy (Al-Zubaidy), an inmate at the Nebraska State Penitentiary (Penitentiary), filed a civil rights action against TEK Industries (TEK) and Barbara Unger (Unger), presenting nine causes of action under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-2000e-17; the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. §§ 48-1101-48-1126; federal civil rights statutes, 42 U.S.C. §§ 1981, 1983; and Nebraska's civil rights statute, Neb. Rev. Stat. § 20-148.  Al-Zubaidy claims he was discharged and harassed based

on his race, sex, religion and national origin. Al-Zubaidy also asserts he was subjected to unlawful retaliation. The district court[1] granted summary judgment in favor of TEK and Unger. We affirm.

## I.    BACKGROUND

Al-Zubaidy is a male Shiite Muslim of Iraqi descent serving a prison sentence for first-degree assault, second-degree assault, and use of a weapon to commit a felony. See State v. Al-Zubaidy, 641 N.W.2d 362, 367 (Neb. 2002). TEK is a private corporation with a manufacturing facility in Fremont, Nebraska, and another manufacturing facility located at the Penitentiary in Lincoln, Nebraska. Under an agreement with Cornhusker State Industries, acting under the authority of the Nebraska State Department of Corrections, TEK offers private venture employment to approximately 110 inmates at the Penitentiary. TEK pays the inmates at least minimum wage, while inmates in other jobs receive between $1.50 and $2.25 per day. TEK employs managers, who are not inmates or Penitentiary employees, to supervise the inmates. However, prison guards are present at all times in TEK's workplace. Unger is TEK's Production Manager at the facility located at the Penitentiary.

In February 1999, TEK hired Al-Zubaidy to work part-time in TEK's Penitentiary die shop. The die shop produces, and eventually distributes, materials used in educational products for schools and for the arts-and-crafts industry. Al-Zubaidy's direct supervisor was Unger. During 1999, Al-Zubaidy had no problems with how Unger treated him. In March 2000, Unger gave Al-Zubaidy "a pretty good evaluation," which resulted in a forty-five cent per hour raise. Al-Zubaidy signed the evaluation in June 2000. Al-Zubaidy received another performance evaluation in March 2001, which resulted in another pay raise.

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

In March 2001, Al-Zubaidy's relationship with Unger began to deteriorate. Al-Zubaidy wrote TEK's president complaining Unger did not like certain workers, including Al-Zubaidy, and Unger did not treat these workers fairly, including white and non-Muslim workers. On March 26, Al-Zubaidy met with Unger and another supervisor to discuss Al-Zubaidy's complaint that Unger had laughed and told another employee, "I didn't understand a single word [Al-Zubaidy] just said." Unger apologized to Al-Zubaidy for the incident. Al-Zubaidy admittedly does not speak English very well, which requires people to ask that he repeat himself. In addition, Al-Zubaidy acknowledges TEK's work space at the Penitentiary is loud, and "sometimes it's hard to hear someone there because it's so loud." Al-Zubaidy did not make any other complaints at this meeting.

On May 2, Al-Zubaidy filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC), alleging discrimination based on race, color, sex, religion and national origin. In this administrative charge of discrimination, Al-Zubaidy made a number of allegations: (1) in June 2000, Unger told another inmate, "don't listen to dumb ass [Al-Zubaidy], he thinks he knows everything"; (2) in August 2000, Unger sprinkled water on Al-Zubaidy, and said, "bless you my child"; (3) in November 2000, Al-Zubaidy jokingly told another employee TEK was going to serve "boiled eggs" for the holiday meal, which prompted Unger to say, "did you hear what [Al-Zubaidy] just said? he said boiled dick"; (4) in January 2001, Unger told Al-Zubaidy to "go to the bathroom . . . to clean [his] underwear" after a near collision in the workplace; (5) in March 2001, Unger told another employee she "didn't understand a single word [Al-Zubaidy] just said"; and (6) Unger tried to get Al-Zubaidy discharged.

In August 2001, Unger promoted Al-Zubaidy to the skilled position of die maker. Even though Al-Zubaidy failed the first test for this position, which usually eliminates the opportunity to work as a die maker, Unger allowed Al-Zubaidy to retake the test, which he passed.

Also in August 2001, the NEOC dismissed Al-Zubaidy's discrimination charge. Noting "[t]he Nebraska Attorney General has issued opinion #99-027 that prison laborers are not employees under the [NFEPA]," the NEOC administratively closed the case because it lacked jurisdiction over Al-Zubaidy's charge.[2] The Equal Employment Opportunity Commission also dismissed Al-Zubaidy's charge, and issued its Notice of Suit Rights.

After filing a Complaint and an Amended Complaint in the district court, Al-Zubaidy filed a twenty-three page (excluding attachments) *pro se* Second Amended Complaint for Civil Rights Violations against TEK and Unger, presenting nine causes of action. Al-Zubaidy alleged TEK and Unger violated Title VII, the NFEPA, and federal and state civil rights statutes. Al-Zubaidy claimed TEK and Unger intentionally discriminated against him based on his race, sex, religion and national origin. Al-Zubaidy's theories of recovery included discriminatory discharge, unlawful harassment and retaliation. An inmate laborer filed an affidavit claiming Unger told him in April 2001 "to report to our Camel Jockey, he will show you how to ride the Camel." Another inmate laborer filed an affidavit swearing Unger set up Al-Zubaidy "by making it appear as though he was responsible for missing tools[, even though] Unger knew that the tools belonged to someone else." Another inmate

---

[2]Responding to a question posed by the NEOC's Executive Director, Nebraska's Attorney General asked "whether prison inmates working for a private venture [i.e., TEK] located at the Nebraska State Penitentiary are considered 'employees' under the meaning of the [NFEPA]." Neb. Att'y Gen. Op., No. 99027, 1999 WL 395096, at *1 (June 7, 1999). Acknowledging it was unclear how Nebraska courts would respond to the question, the Attorney General turned to federal cases defining the term "employee," a Nebraska Worker's Compensation case addressing the employment status of an inmate, and Nebraska cases discussing principles governing the employment relationship. Id. at *1-5. After reviewing the principles enunciated in those contexts, the Attorney General concluded Nebraska courts would determine inmates are not employees under the NFEPA. Id. at *5.

submitted an affidavit stating "a homemade key was alleged to have been found" on October 23, 2001, and attributed to Al-Zubaidy. As a result of the discovery of this contraband, the Penitentiary placed Al-Zubaidy in segregation, which resulted in Al-Zubaidy's discharge from TEK for excessive absences. Al-Zubaidy admitted he does not have any evidence that Unger set him up.

Granting summary judgment to TEK and Unger on all claims, the district court dismissed Al-Zubaidy's Second Amended Complaint with prejudice. First, the district court relied on the Nebraska Attorney General's opinion to hold Al-Zubaidy's "claims pursuant to NFEPA must be dismissed because under Nebraska law, prison laborers are not 'employees' entitled to redress under NFEPA." Second, the district court dismissed Al-Zubaidy's discriminatory discharge claims because "the summary judgment record contains no evidence on which a jury could reasonably find that [Al-Zubaidy]'s race, color, religion, sex, or national origin played any part in the decision to terminate [Al-Zubaidy]'s employment." Finally, the district court dismissed Al-Zubaidy's hostile work environment claims, concluding (1) most of the remarks made against Al-Zubaidy "bore no relation to [his] gender, religion, race or national origin"; and (2) "the alleged harassment 'was not so severe or pervasive as to alter a term, condition, or privilege of [Al-Zubaidy's] employment.'"

Al-Zubaidy appeals the district court's grant of summary judgment to TEK and Unger. Al-Zubaidy contends the district court erroneously dismissed the (1) discriminatory discharge claims; (2) hostile work environment claims; (3) derivative civil rights claims; and (4) NFEPA claims. Al-Zubaidy does not appeal the district court's dismissal of Al-Zubaidy's retaliation claims, and his attorney acknowledged at oral argument Al-Zubaidy has abandoned those claims.

## II. DISCUSSION

### A. Standard of Review

We review de novo the district court's grant of summary judgment to TEK and Unger. Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003). Summary judgment is proper if the evidence, viewed in the light most favorable to Al-Zubaidy and giving him the benefit of all reasonable inferences, shows there are no genuine issues of material fact and TEK and Unger are entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c). "Evidence, not contentions, avoids summary judgment." Mayer, 318 F.3d at 809.

### B. Discriminatory Discharge

Title VII prohibits an employer from discharging an individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Al-Zubaidy claims TEK did not discharge him because of his excessive absences, but instead discharged him based on his race, sex, religion and national origin.

Al-Zubaidy's discriminatory discharge claims must be analyzed under the McDonnell Douglas burden-shifting framework. Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 656 (8th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)). Under this framework, Al-Zubaidy must establish a prima facie case of discrimination by showing (1) he is a member of a protected class, (2) he was qualified for his position with TEK, and (3) despite being qualified, he was discharged. Id. If Al-Zubaidy successfully establishes his prima facie case, a rebuttable presumption of discrimination arises. Id. At this point, the burden of production shifts to TEK and Unger to articulate a legitimate, nondiscriminatory reason for discharging Al-Zubaidy. Id. If TEK and Unger articulate such a reason, the presumption of discrimination disappears, and Al-Zubaidy must prove the proffered reason for the discharge was merely a pretext for intentional discrimination. Id. Even though we use the McDonnell Douglas test as a tool to uncover intentional

discrimination, Al-Zubaidy never loses the ultimate burden of proving TEK and Unger intentionally discriminated against him. See id.

We agree with the district court that Al-Zubaidy failed to establish a submissible claim of discriminatory discharge. We initially conclude Al-Zubaidy failed to establish a prima facie case because he was not qualified for his position at the time he was discharged–he was unable to work at all. Regardless of the status of Al-Zubaidy's prima facie case, however, TEK and Unger contend they discharged Al-Zubaidy for excessive absences, which constitute a legitimate, nondiscriminatory reason for discharge. Given this proffered reason for discharge, Al-Zubaidy bears the burden of showing this reason was a pretext for intentional discrimination. To this end, Al-Zubaidy contends Unger connived to set him up so she could discharge him based on his race, sex, religion and national origin. No reasonable inference can establish these claims. First, Al-Zubaidy presented no evidence, other than mere contentions, that Unger set him up to discharge him. Second, the record defies these contentions. Unger consistently gave Al-Zubaidy favorable evaluations, which resulted in two wage increases. In August 2001, when Al-Zubaidy tested for the position of die maker but failed the test, Unger ignored TEK's policy and allowed Al-Zubaidy to retake the test. When Al-Zubaidy used Unger's opportunity and passed the test, Unger promoted Al-Zubaidy to die maker. This evidence does not allow a reasonable inference that Unger plotted to discharge Al-Zubaidy based on his race, sex, religion or national origin.

On appeal, Al-Zubaidy attempts to recast his discriminatory discharge claim as a failure-to-rehire claim. Al-Zubaidy did not file an administrative charge of discrimination based on TEK's failure to rehire him, and he failed to argue this theory before the district court. A discriminatory failure-to-rehire claim is wholly distinct from a discriminatory discharge claim, and both claims must be administratively exhausted before a federal court has jurisdiction over the claims. Shelton v. Boeing Co., 399 F.3d 909, 913 (8th Cir. 2005). Furthermore, it has long been the general rule

"that a federal appellate court does not consider an issue not passed upon below," Singleton v. Wulff, 428 U.S. 106, 120 (1976), and we have no interest in allowing Al-Zubaidy to recast his cause of action on appeal to survive the district court's dismissal, cf. Associated Ins. Mgmt. Corp. v. Ark. Gen. Agency, 149 F.3d 794, 798 (8th Cir. 1998) (declining "to recast the cause of action to create diversity jurisdiction that was neither pleaded nor requested in the district court"). Therefore, we decline Al-Zubaidy's invitation to allow a failure-to-rehire claim to proceed.[3]

## C.    Hostile Work Environment

Title VII also prohibits an employer from subjecting its employees to a hostile work environment "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see, e.g., Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 n.10 (2002) (racial harassment); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) (sexual harassment). To establish a hostile work environment claim, Al-Zubaidy must show (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic under Title VII, (4) the harassment affected a term, condition or privilege of employment, and (5) employer liability. See generally Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001). There can be no doubt federal

---

[3]To the extent Al-Zubaidy claims TEK's failure to rehire him proves its proffered reason for discharging him (i.e., excessive absences) was pretextual, we reject this late argument. Nothing in the record indicates TEK would not have discharged Al-Zubaidy based on excessive absences. The only evidence that could assist Al-Zubaidy with this new argument is an affidavit filed by an inmate who stated he was rehired after the reasons for his discharge were deemed unfounded. However, this bare-bones affidavit does not explain that inmate's race, color, religion or national origin such that we could determine whether he is similarly situated to Al-Zubaidy, nor does the affidavit explain any of the circumstances surrounding the inmate's discharge or rehiring. Thus, no reasonable inferences can be gleaned from the inmate's affidavit to establish TEK discharged Al-Zubaidy based on his race, sex, religion or national origin.

harassment standards are demanding.  See McCurdy v. Ark. State Police, 375 F.3d 762, 768 (8th Cir. 2004).  Indeed, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  The Supreme Court also has made it abundantly clear that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Id. (citation omitted).

Title VII is violated only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, 477 U.S. at 65, 67).  We can determine "whether an environment is 'hostile' or 'abusive' . . . only by looking at all the circumstances[, which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment.  For example, "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact.'" Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).  The Court often has made the point that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. (quoting Oncale, 523 U.S. at 82).  The Court implores lower courts to apply the demanding harassment standards to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Id. (citation omitted).

We conclude the district court appropriately dismissed Al-Zubaidy's hostile work environment claims because his workplace at the Penitentiary was not permeated with severe or pervasive harassment sufficient to alter the terms, conditions or privileges of employment. Al-Zubaidy produced only a few comments Unger allegedly made over a ten-month period. Most of these offhand and isolated comments were wholly unrelated to each other and had a tenuous connection to race, sex, religion or national origin. Unger's comments were infrequent, were not severe, never physically threatened Al-Zubaidy, were more akin to mere offensive utterances, and did not interfere with Al-Zubaidy's work performance. Indeed, Al-Zubaidy even received pay raises and a promotion both before and after Unger made these comments. Al-Zubaidy's evidence falls far short of the Supreme Court's demanding harassment standards.

### D.    Civil Rights Claims

In a one-paragraph argument in his brief, Al-Zubaidy explicitly ties the fate of his federal and state civil rights claims to his success on his Title VII claims. Because we hold the district court properly dismissed Al-Zubaidy's Title VII claims, we likewise conclude Al-Zubaidy's derivative civil rights claims lack merit.

### E.    NFEPA

Finally, Al-Zubaidy argues the district court mistakenly relied on the Nebraska Attorney General's opinion in dismissing Al-Zubaidy's claims under the NFEPA. Al-Zubaidy maintains the district court should not have dismissed the NFEPA claims, but rather should "have certified the question [of whether TEK's prison laborers are employees under the NFEPA] to the Nebraska Supreme Court, or, at the very least, dismissed the claim without prejudice if it declined to exercise jurisdiction in view of its dismissal of the other claims."

Similar to Title VII, the NFEPA prohibits an employer from discharging or harassing an individual "because of such individual's race, color, religion, sex,

disability, marital status, or national origin." Neb. Rev. Stat. § 48-1104(1). Both the Nebraska Supreme Court and our court have stated the NFEPA "is patterned after Title VII," and, therefore, "it is appropriate to consider federal court decisions construing the federal legislation" when considering questions under the NFEPA. City of Fort Calhoun v. Collins, 500 N.W.2d 822, 825 (Neb. 1993); see also Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 723 (8th Cir. 2002).

Whether inmates working for TEK at the Penitentiary are employees under the NFEPA is a vital policy issue for the State of Nebraska. Its importance is underscored by the NEOC's written request to the Nebraska Attorney General asking for an answer to this consequential question. However, the posture of this case dissuades us from offering what would amount to a gratuitous analysis of whether the Attorney General rightly decided whether an inmate working for TEK at the Penitentiary is an employee under the NFEPA. Al-Zubaidy's state claims under the NFEPA mirrored his federal claims under Title VII, and his discrimination and harassment claims under Title VII failed. Therefore, Al-Zubaidy would enjoy no greater success with those same claims under the NFEPA.

Similarly, Al-Zubaidy's retaliation claim under Title VII was dismissed, and Al-Zubaidy failed to appeal that dismissal or even discuss the retaliation claim in either his initial brief or in his reply brief. At oral argument, Al-Zubaidy acknowledged he has abandoned his Title VII retaliation claim. Therefore, we deem Al-Zubaidy's failure to raise the retaliation claim amounts to an abandonment of that claim. Jasperson v. Purolator Courier Corp., 765 F.2d 736, 740 (8th Cir. 1985). The failure of Al-Zubaidy's Title VII retaliation claim likewise dooms his retaliation claim under the NFEPA.

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of TEK and Unger.

_____