# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4474

_____

| | | |
|---|---|---|
| Rashid Arraleh, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| County of Ramsey; Terry Zurn, | * | |
| Individually, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: June 15, 2006
Filed: September 7, 2006

_____

Before SMITH, HEANEY, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Rashid Arraleh sued his former employer, the County of Ramsey ("the County"), and his former supervisor, Terry Zurn, in his individual capacity, asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17; 42 U.S.C. § 1981; and the Minnesota Human Rights Act, Minn. Stat. § 363A.01-.41. Specifically, Arraleh alleged that the County discriminated against him on the basis of race and national origin. He further alleged that the County retaliated against him

and created a hostile work environment. The district court[1] granted summary judgment to the County and Zurn on all of Arraleh's claims. Arraleh appeals. We affirm.

## I. *Background*

Workforce Solutions ("WFS") is a County program that assists people in finding gainful employment. In late 2001, WFS needed to hire an Employment Guidance Counselor ("EGC") to meet its obligations. Terry Zurn, supervisor for WFS's Displaced Worker Program, decided to hire a temporary, six-month EGC. Zurn, with approval of WFS's director, Patricia Brady, hired Rashid Arraleh. Arraleh, a black Muslim immigrant from Somalia, began working as an EGC on December 17, 2001. By state law and corresponding County personnel rules, Arraleh's temporary employment was predetermined to end no later than May 31, 2002. Arraleh accepted the position, hoping to obtain a permanent position with WFS.

To assist Arraleh in his new position, Zurn assigned Kim Kruelle, a Korean American with ten years' experience as an EGC, to mentor Arraleh. During Arraleh's six-month term, at least four of his WFS coworkers and at least two clients made complaints against him. Arraleh developed a history of double-booking, missing and appearing late for client appointments, leaving the office without signing out or informing his supervisor of where he was going, and poor customer service.[2] Arraleh

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2]The following are Arraleh's recorded deficiencies:

On January 7, 2002, Arraleh could not be located even though he was supposed to be with several other EGCs for client-intake meetings. In addition, during January 2002, Zurn reprimanded Arraleh twice for taking vacation without proper notice and leaving the building without signing out.

At a lunch with a dislocated worker, Arraleh said in a loud voice, "Who do I have to sleep with to get service around here?"

On March 7, 2002, Kruelle met with Arraleh to discuss a situation in which a client had arrived for a scheduled appointment only to learn that Arraleh had signed out for the day. She also wanted to discuss the importance of keeping client appointments, attending team meetings, and not double booking. Arraleh told her that she was saying these things only because he was a "little black boy." Kruelle then stopped the meeting and asked another staff member to witness the balance of the discussion because she felt Arraleh was implying that she was a racist. Arraleh then said he was "just joking."

On March 8, 2002, Arraleh was "in a panic" when a client showed up for a scheduled appointment. Arraleh said "WFS" had "another mix-up," but the schedule showed that Arraleh actually caused the scheduling error. Arraleh blamed another employee for entering the appointment incorrectly.

On March 12, 2002, at 9:00 a.m., Arraleh met an applicant for WFS services in the lobby and scheduled an appointment to meet the client at 2:00 p.m. in the afternoon. Arraleh arrived for the appointment 55 minutes late.

On March 14, 2002, Zurn met with Arraleh to assess his performance and advised Arraleh that he needed to improve his poor customer service and poor time management, citing a recent example where Arraleh had missed a client appointment because he had also scheduled a vacation day. Zurn advised Arraleh that such repeated conduct would be grounds for dismissal in some businesses.

On April 2, 2002, Zurn spoke with Arraleh about another missed client appointment where Arraleh scheduled the appointment for April 1 and then took the day off as a flextime day. Arraleh said he had "totally forgotten" about the appointment. Zurn then counseled Arraleh about his scheduling practices.

On April 25, 2002, Arraleh wrote Kruelle two e-mails, the first of which stated:

Tell the world how wonderful I am tell the world that you have see [sic] a deity a divine person tell the world you Kim Kruelle swears you have seen the sight of God with your own [sic] and he works with you. From the Almighty himself

does not dispute his documented deficiencies; instead, he alleges that double-booking and missing appointments were common occurrences at WFS. Coworkers Donna Waldhauser, Loretta Novak, and Mary Haigh testified in support of Arraleh's claims.[3]

---

Later the same afternoon, Arraleh wrote:

NO THE ANSWER IS I AM JESUS

On May 7, 2002, Arraleh asked employees at the WFS front desk to cancel his appointments for the day. All clients were canceled but two. When the first client arrived promptly at 10:00 a.m., Kruelle introduced herself to the client. The client responded, "He's not here again?" The client then told Kruelle that it was "apparent that Rashid was new to the job." Kruelle apologized and said that she would keep the client's file.

[3]Donna Waldhauser, an EGC, testified that she was surprised by complaints from Arraleh's coworkers that Arraleh missed appointments because she was aware of other employees, including Kruelle, who had also missed appointments. Waldhauser herself admitted to occasionally missing appointments. However, Waldhauser was unaware of any coworker complaints to supervisors about other employees missing appointments, except for those about Arraleh.

Loretta Novak, an EGC, testified that some of her coworkers criticized Arraleh for missing appointments or double-booking appointments. She stated that a white employee hired at the same time as Arraleh, Mary White, also missed appointments and double-booked, but was not subject to criticism. According to Novak, the other counselors covered for White and did not report the incidents to Zurn. Novak did meet with Zurn to discuss her concerns about the hostile way employees were treating Arraleh, but Zurn did not respond.

Also, another EGC, Mary Haigh, testified that she found it surprising that her coworkers complained that Arraleh missed appointments with clients because it was a routine occurrence in their department to miss appointments. She stated that white EGCs miss client meetings or are unable to be located during the work day as often as several times per week. These employees do not sign out when they leave the office. However, Haigh admitted that she never heard anyone complain to any supervisors about these employees missing client appointments or being absent from

According to Arraleh, Zurn treated him differently than white employees. Specifically, Arraleh contends Zurn made a computer log of complaints against him but never did so for white employees. When complaints were lodged against other employees, Zurn simply spoke with the individual and made no record of the complaint. In contrast, when white employees complained about Arraleh, Zurn did not discuss the matter with him or disclose his computer log's contents.

Toward the end of Arraleh's six-month temporary employment, Zurn provided a letter of reference at Arraleh's request because Arraleh was looking for a job. In addition, Zurn informed Arraleh of an open part-time Resource Specialist position.

On May 22, 2002, Arraleh met with Brady to complain that he did not think it was fair that he was "excluded" from a department lunch party because only ham was served. During the meeting, Arraleh said he "spoke his heart out" regarding how he felt about the department. In response to his specific complaint about ham being served, Brady apologized, said that WFS "should have known better," and sent out an e-mail to the staff "to be sensitive to other people's religions."

Brady also asked Arraleh to put his other concerns about the department in writing. Arraleh did so. In his written complaint, Arraleh asserted that racism and race issues "are so fundamental in WFS that they seem almost an integral component." Specifically, Arraleh claimed to have witnessed coworkers "use words like 'those people,' those damn Muslims." In addition, he overhead coworkers say "'[y]ou people are emotional[,]' referring to people of African descend [sic]." Also, Arraleh said that he "personally ha[d] been insulted, degraded, categorized as lazy and skipping work [sic]. While all along my supervisor knew where and what I was doing." He said that "[e]very time when two people of color go to lunch or talk there is imminent danger for WFS 'white' staff" because "[t]hey assume that their jobs are in jeopardy or we are

_____

the office without signing out.

up to no good." Finally, Arraleh wrote that "[w]hen we get passed over for a position or not allow[ed] to participate on a committee or interviewing panel, we should understand that there were other factors involved not our race." Arraleh thinks he gave Brady the written complaint two days after their meeting. He "presumed she was going to find out what was going on" and "guess[ed] she did."

In response to the complaint, Brady contacted Zurn and advised him that Arraleh felt that the staff was singling him out because he was black and Muslim. Zurn responded that Arraleh's situation involved sub-par client service and that Arraleh's coworkers were distancing themselves from Arraleh because of their frustration with having to pick up Arraleh's workload. Brady also contacted George Hamm, her assigned Human Resources representative, asking him to follow up on Arraleh's complaint. In turn, Hamm contacted Arraleh, advised him that the County takes discrimination seriously, and set up an appointment with Arraleh on June 3, 2002. Arraleh canceled the appointment.

After Arraleh's complaints to Brady in May 2002, coworker Michael Ellison told Arraleh that he had "cooked his own goose" and there was no way that WFS would hire him for a permanent position. In addition, Arraleh claims to have overheard a conversation in which a County Planner told Zurn that "[g]iving [Arraleh] a job is like raising terrorist kids."

The County's temporary employees may apply for available permanent positions. When a department has an opening for a permanent position, it submits a request to the County's Human Resources Department for a list of eligible applicants. These lists, generated independently by Human Resources, contain the names of the top applicants based on points awarded for application-question responses and test scores. The department seeking the lists, in this case WFS, must hire individuals appearing on these lists.

Shortly after his hiring and during Arraleh's temporary employment, WFS requested four lists of eligible applicants from Human Resources. First, on January 29, 2002, WFS received a list that did not include Arraleh's name for any of four EGC openings. WFS hired two Asian persons, a Caucasian, and a Somali to fill these positions. Each of these hires was for the "Welfare to Work" section of WFS, not Zurn's Displaced Worker program where Arraleh worked. Second, on May 13, 2002, WFS received an updated list of eligibles to fill one EGC position. Arraleh's name did not appear on this list either. Third, on May 28, 2002, WFS requested a third updated list to fill two EGC Aide positions; Arraleh's name did appear on the list for these positions. Based upon his scores, Arraleh ranked 6th out of 13 eligible candidates and was interviewed for the positions. Finally, on June 3, 2002, Human Resources supplied WFS with a fourth updated list of eligibles to fill an EGC position. Arraleh appeared on the list of eligibles and ranked second out of the four applicants. He was not interviewed for this position.

Bruce Heinz, a WFS supervisor, and Zurn interviewed Arraleh for the EGC Aide positions. Prior to interviewing Arraleh, they consulted Hamm, who advised them to follow the already-defined selection process and to interview and evaluate Arraleh in the same manner as any other candidate. Hamm advised Heinz and Zurn that the hiring process and Arraleh's complaint were separate matters and that Hamm would follow up on the latter with Arraleh in an exit interview.

After interviewing all of the applicants for the EGC Aide positions, Heinz and Zurn recommended to Brady that she hire Sharron Gates and JoAnn Mays. Both women are African American and ranked eighth and tenth on the list, respectively. WFS awarded the EGC position to an African-American male, Walter Rhodes, who ranked fourth on the final list of eligibles.

On June 21, 2002, Zurn wrote Arraleh a rejection letter, which stated that WFS's hiring decision "was based on our determination that the education and work experience of the candidate we selected best fits the requirements of this position."

Arraleh subsequently filed a charge of discrimination with the Minnesota Department of Human Rights and the Equal Employment Opportunity Commission (EEOC). After receiving notices of his right to sue, Arraleh commenced this lawsuit, alleging that the County discriminated against him on account of his race and national origin by declining to hire him for continued employment, retaliated against him for the complaint he made to Brady and created a hostile work environment.

## II. *Discussion*

Arraleh raises three arguments on appeal. First, he argues that the district court improperly granted summary judgment to WFS and Zurn on his failure to hire claim. Second, he argues that the district court erred by granting summary judgment to WFS and Zurn on his retaliation claim. Finally, he asserts that the district court erred by summarily dismissing his hostile work environment claim.

"We review grants of summary judgment de novo." *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 342 (8th Cir. 2006) (internal quotations and citation omitted). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id*. (internal quotations and citations omitted).

## A. *Failure to Hire*

Arraleh asserts that he provided direct evidence of discrimination, including a remark by a County Planner that hiring Arraleh was like "raising little terrorist kids" and a remark by Brady that employees should "leave their blackness behind." In addition, he maintains that the district court erred in its application of the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), by

requiring him to show that he met more than the minimum objective qualifications of the positions in his prima facie case. Finally, Arraleh argues that he was objectively more qualified for the positions than the candidates hired.

"[A] plaintiff may survive the defendant's motion for summary judgment in one of two ways." *Griffith v. Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). First, the plaintiff may present direct evidence of discrimination, which "is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Id*. (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). When a plaintiff provides direct evidence of discrimination, the three-part *McDonnell Douglas* analysis is unnecessary. *Id*. "But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient proof of pretext." *Id*.

"[N]ot every prejudiced remark made at work supports an inference of illegal employment discrimination." *Rivers-Frison v. Southeast Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998). "We have carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Id*. (internal quotations, citations, and alteration omitted).

Here, Arraleh asserts that the County Planner's statement to Zurn that "[g]iving [Arraleh] a job is like raising terrorist kids" is direct evidence of discrimination. However, this remark was made by a County employee with no authority to make the hiring decision on Arraleh's application. The record does not contain evidence

showing that the County Planner's comment influenced Zurn not to hire Arraleh for a permanent position. Arraleh's evidence does not show that, after hearing the County Planner's remark, Zurn failed to review Arraleh's application or consider his performance evaluations before recommending to Brady that she hire other candidates. *Fast v. S. Union Co., Inc.*, 149 F.3d 885, 891 (8th Cir. 1998) (noting that the decisionmaker, who heard discriminatory comments made by a nondecisionmaker, failed to review the plaintiff's personnel file and performance evaluations before terminating the plaintiff's employment).

As for Brady's comment to Arraleh that "black people are expected to leave their blackness behind," Arraleh failed to provide context for this statement and show some link to his not being hired. Without more, no reasonable fact finder could, on the basis of Brady's remark, find that Zurn's hiring decision was racially motivated. At most, the comment is an ambiguous statement by a decisionmaker unrelated to the decisional process. The comment does not constitute direct evidence of discrimination.

Finding that no direct evidence of discrimination exists, we must evaluate Arraleh's claim under the *McDonnell Douglas* burden-shifting analysis. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). A plaintiff establishes a prima facie case in a "failure to hire" case when he proves that (1) he is a member of a protected class; (2) he was qualified for the position for which the employer was accepting applications; (3) he was denied the position; and (4) the employer hired someone from outside the protected class. *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994).

Once the plaintiff establishes his prima facie case, the employer may rebut the prima facie case by articulating one or more legitimate, nondiscriminatory reasons for its decision. *Pope v. ESA Serv., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005). This burden is not onerous, nor does the explanation need to be demonstrated by a preponderance

of the evidence. *Floyd v. Mo. Dept. of Soc. Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). If the employer presents a nondiscriminatory reason for its decision, the plaintiff is "left with 'the opportunity to demonstrate that the proffered reason is not the true reason for the employment decision.'" *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th cir. 2006) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

A plaintiff may establish pretext by showing "that the employer changed its explanation for why it fired the employee . . . ." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). However, we are mindful that "[t]here is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time." *Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362 (8th Cir. 1997); *see also Lowe v. J.B. Hunt Transp.*, 963 F.2d 173, 174–75 (8th Cir. 1992) (holding in an age discrimination case that "[i]t is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.").

We have previously addressed a plaintiff's argument that her employer's "discriminatory animus [was] evidenced by the fact that [her employer] hired someone less qualified than her for [the position]." *Kincaid v. City of Omaha*, 378 F.3d 799 (8th Cir. 2004). In rejecting the plaintiff's argument, we held:

> Although an employer's selection of a less qualified candidate "can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual," it is the employer's role to "[i]dentify [ ] those strengths that constitute the best qualified applicant." *Duffy v. Wolle*, 123 F.3d 1026, 1037–38 (8th Cir. 1997). This is so because "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the

extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

*Id.* at 805. Because the plaintiff could not show that the employer hired a "*less* qualified applicant" as opposed to an equally qualified candidate, her claim failed. *Id.* (emphasis in original) (citing *Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1311 (8th Cir. 1995) ("Although [an employee] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [the employer's] stated rationale for giving the position to another is pretextual."); *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988) ("The mere existence of comparable qualifications between two applicants, one black male and one white female, alone does not raise an inference of racial discrimination.")).

We hold that even if Arraleh, contrary to the district court's determination, did establish a prima facie case of intentional discrimination, he failed to present evidence sufficient to support a finding that the County's declared reason for declining to hire him was a pretext for race and national origin discrimination. *See Hennessey v. Good Earth Tools, Inc.*, 126 F.3d 1107, 1108 (8th Cir. 1997) ("We hold that even if Hennessey, contrary to the District Court's determination, did establish a prima facie case under the ADEA and MHRA (a question we need not and do not decide), he did not present evidence sufficient to support a finding that Good Earth's declared reason for firing him was a pretext for age discrimination.").

The County and Zurn offered a legitimate, nondiscriminatory reason for not hiring Arraleh. Zurn's rejection letter to Arraleh stated that WFS's decision not to hire Arraleh "was based on our determination that the education and work experience of the candidate we selected best fits the requirements of this position." Zurn also testified in his deposition that he and Heinz recommended that Brady hire Mays because "she was the best candidate for the position." In affidavits submitted by Brady

-12-

and Zurn, both stated that they did not hire Arraleh, specifically, because of his poor performance and because he was not a "team player."

Therefore, the burden shifted back to Arraleh to prove pretext. While Arraleh argues that he established pretext by showing that the County changed its explanation for why it did not hire him, the later affidavits by Brady and Zurn do not give a different explanation but instead elaborate on the same explanation. Specifically, the testimony showed why the candidates selected had better "work experience" and better "fit the requirements for the position" than Arraleh. We note also that the same supervisor—Zurn—both hired and subsequently declined to hire Arraleh for a permanent position within a six-month time period. This fact suggests that racial and national origin discrimination were not the motivating factors behind the adverse employment action.

Arraleh argues disparate disciplinary treatment for missing and double-booking appointments. He contends white employees did the same things without being reprimanded. However, Arraleh presented no evidence that Brady or Zurn knew of such conduct and treated whites preferentially. In fact, his own witnesses admitted that they were unaware if any of the white employees' conduct alleged by Arraleh was reported to Zurn. Furthermore, the candidates actually hired for the jobs Arraleh applied for were all minorities with the exception of one white male. Several white applicants on the list of eligibles were rejected for the positions. These facts undercut Arraleh's argument that the County was engaging in discrimination on the basis of race or national origin. We decline to second guess the employer's identification of those strengths that constitute the best qualified applicant.

Accordingly, we hold that the district court properly granted summary judgment to the County and Zurn on Arraleh's failure to hire claim.

B. *Retaliation*

Arraleh's second argument on appeal is that the district court erred in dismissing his claim for retaliation because it ignored settled circuit precedent that a temporal proximity of three weeks between protected conduct and the adverse employment action is sufficient to articulate a prima facie case of retaliation as a matter of law. In addition, he argues that the district court wholly ignored his evidence of pretext.

In a retaliation claim, the plaintiff establishes his prima facie case by showing that: "(1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Singletary v. Mo. Dept. of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005).

We again assume, without deciding, that Arraleh has established his prima facie case of retaliation. Therefore, we address only whether Arraleh proved pretext.

"An inference of a causal connection between a charge of discrimination and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Wallace*, 442 F.3d at 1119 (internal quotations and citation omitted). Engaging in protected activity "does 'not insulate an employee from discipline for . . . disrupting the workplace.'" *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir. 2005) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999)) (alteration in original).

In the present case, a period of three weeks between Arraleh's complaint of discrimination and his failure to receive a permanent position with the County may suffice to establish causation in his prima facie case. However, temporal proximity alone is generally insufficient to prove pretext. As we previously noted, the County

-14-

and Zurn presented evidence regarding Arraleh's deficiencies during his temporary employment, all of which were recorded before Arraleh ever complained of discrimination. Therefore, we hold that the district court properly granted summary judgment to the County and Zurn on Arraleh's retaliation claim.

## C. *Hostile Work Environment*

Finally, Arraleh argues that, in dismissing his hostile work environment claim, the district court "wholly ignored the affidavits of Arraleh's co-workers demonstrating that some of Arraleh's co-workers were vehemently, passionately hostile toward black men, immigrants and Muslims generally, and Arraleh specifically."[4] In addition,

---

[4]From the beginning of his employment, Arraleh claims that he was subjected to intense negative scrutiny and derogatory comments from his coworkers about his race, appearance, and national origin. These comments included statements such as "today your skin doesn't look as white as it normally does," "it's difficult to work with you people," "you are always late," "you people are so emotional, is your culture always like this," "the reason you people never get jobs is because you are always listening to loud music," "employers never call back you people," "I don't think you do as much work as we do," "is your hair real," "giving Rashid a job is like raising little terrorist kids," and "Mr. Cocoa." In addition, according to Arraleh, WFS director Patricia Brady, an African-American female, told him that "black people are expected to leave their blackness behind." When asked how these statements related to his race or national origin, Arraleh replied, "I don't know. They just felt I was lazy, I was not up to standard, I was not as much human as they were. That is how I felt personally."

Arraleh supported his allegations with testimony from Haigh and Waldhauser. Haigh testified that she heard many negative and offensive comments about Arraleh, such as referring to Arraleh as "lazy" and "stupid," stating that Arraleh did not know what he was doing, and calling Arraleh "little" and "cute." In addition, Haigh testified to hearing a coworker say that "Muslims should all be killed" after meeting Waldhauser's husband, who is from Kuwait.

Waldhauser testified that Arraleh's coworkers made derogatory remarks both to him and about him regarding his skin, hair, and appearance. For example, she testified that a coworker called him the "beautiful one." In addition, she heard

-15-

Arraleh argues that the district court should have considered evidence that two of his coworkers were so concerned about the hostility expressed toward Arraleh that they approached Zurn to discuss it.

To establish a hostile work environment claim, the plaintiff must establish that: (1) he is a member of a protected class; (2) he was exposed to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it. *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005).

To demonstrate that harassment altered the terms and conditions of one's employment, the conduct alleged must be severe and pervasive, both objectively and subjectively. *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998). When determining whether a work environment is hostile or abusive, we examine all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Al-Zubaidy*, 406 F.3d at 1038.

Harassment standards are demanding. *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 1039 (internal quotations and citations omitted) (holding that the district court properly dismissed plaintiff's hostile work environment claims because "[m]ost of [the manager's] offhand and isolated comments were wholly unrelated to each other and had a tenuous connection

disparaging remarks about Muslims and African immigrants generally. In addition to disparaging remarks made by coworkers, Waldhauser also interpreted some coworkers' comments as suggesting that Arraleh was not working.

to race, sex, religion or national origin."). "Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to support a claim of hostile work environment. *Elmahdi v. Marriott Hotel Servs., Inc*, 339 F.3d 645, 653 (8th Cir. 2003) (internal quotations, alterations, and citation omitted).

Even if the plaintiff can establish that the harassment is "severe and pervasive," the plaintiff must then present evidence that the employer "knew or should have known about the harassment and failed to respond in a prompt and effective manner." *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 801 (8th Cir. 2003). In determining whether the employer failed to take "prompt and effective remedial action to end the harassment," we consider "the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment." *Id.* (internal quotations and citation omitted).

Here, Arraleh testified as to statements he heard various coworkers make, and two of his coworkers, Haigh and Waldhauser, testified to hearing other employees make disparaging remarks not only about Arraleh but also about Muslims and African immigrants in general. We conclude Arraleh's evidence does not meet the rigorous standards reflected in circuit precedent to support a hostile work environment claim. As in *Al-Zubaidy*, many of the alleged comments were wholly unrelated to Arraleh's race or national origin or had a tenuous connection to them. In fact, when asked what any of the comments had to do with his race or national origin, Arraleh responded that he did not know; he just felt that his coworkers thought he was lazy and "not up to standard."

Furthermore, Arraleh's claim is weakened by the absence of evidence that the comments interfered with his ability to perform his duties as an EGC. Many of the comments were not made in Arraleh's presence or made specifically about Arraleh.

-17-

Finally, even if we concluded that Arraleh satisfied the first four elements of a hostile work environment claim, he did not provide evidence that the County failed to respond to the harassment in a "prompt and effective manner." After Arraleh met with Brady to discuss his complaint of harassment, Brady immediately contacted Hamm, the Human Resources representative, and asked him to follow up on Arraleh's complaint. Then, Hamm contacted Arraleh, advised him that the County took such issues very seriously, and set up an appointment with Arraleh to discuss the complaint. Arraleh canceled the appointment with Hamm.

Therefore, we find no error in the district court's grant of summary judgment to the County and Zurn on Arraleh's hostile work environment claim.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court in all respects.[5]

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In my view, there are material issues of fact that made summary judgment inappropriate on Rashid Arraleh's claims of hostile work environment, failure to hire, and retaliation.

Arraleh is a black Muslim immigrant from Somalia. During his six-month tenure of employment with Ramsey County, he was directly subjected to the following comments:

- "Today, your skin doesn't look as white as it normally does" (Appellant's App. at 48);

---

[5]"Because [Arraleh's] claims under the Missouri Human Rights Act are premised on the same factual bases as his [federal] claims, they must also fail." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999).

- Being referred to as "Mr. Cocoa" (*id.* at 59-61);

- "Is your hair for real?" (*id.* at 56);

- "It's very difficult to work with you people" (*id.* at 52);

- African-Americans are "very difficult to work with" because they are "very emotional" and "take things too personally" (*id.* at 43); and

- "[B]lack people are expected to leave their blackness behind" (*id.* at 41).

Given this litany, it is obvious that this is not a case of an isolated, backhanded comment. Rather, it was a stream of comments that reveal an office that was hostile toward Arraleh because of his race and religion. This behavior infected the entire office environment, as Arraleh's co-workers observed discriminatory actions and behavior. *See Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2nd Cir. 2001) (noting that "evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment.") Mary Haigh attested that a co-worker named Mary Michael vehemently stated, "Muslims should be killed." (Appellant's App. at 1.) In fact, Michael's comments about Arraleh, in particular, and Muslims, in general, were so volatile and angry that Haigh tried to avoid mentioning Arraleh's name and refused to discuss anything related to Muslims and the Middle East.

Waldhauser attested that she, too, heard a steady stream of disparaging comments about Muslims and African immigrants, including the statement that "Muslims should all be killed." (*Id.* at 12.) These views became personalized to the point that Arraleh was subjected to intense scrutiny by his co-workers, several of whom repeatedly called Waldhauser to learn if Arraleh had missed or double booked

appointments. This happened even though Waldhauser testified that Arraleh's immediate supervisor had herself missed numerous appointments on a project she shared with Waldhauser.

Loretta Novak, while working in another location, attested she saw similar behavior toward Arraleh. He was criticized for missing or double booking appointments, even though the same behavior from a similarly situated white employee was regularly tolerated. Even though Waldhauser and Novak worked in separate offices, they found the behavior so unacceptable that they complained to Zurn that Arraleh was facing unwarranted hostility. Moreover, Waldhauser and Novak met with Patricia Brady, WFS's director, after Arraleh's employment term finished to again complain about the discrimination he suffered.

Arraleh clearly felt he was the victim of hostility based on his race and religion when he overheard a county planner say, "[g]iving [Arraleh] a job is like raising terrorist kids," (*id.* at 66) and being directly told by a supervisor that he needed to leave his blackness at the door. Objectively, three coworkers felt strongly enough about the nature and effect of these comments that two reported it to Zurn and a third acted by refusing to mention Arraleh's name. In other words, three reasonable, objective coworkers found that these bigoted attitudes toward Arraleh were prevalent; two of those coworkers believed it resulted in Arraleh being subjected to a heightened level of job scrutiny.

In this instance, Arraleh alleges he was subjected to daily comments and actions over a relatively short period of time–six months. Arraleh also presents the testimony of coworkers who found the actions and comments directed at Arraleh equally offensive and believed that these attitudes subjected Arraleh to a stricter code of conduct than was applied to white coworkers. I have no trouble concluding that Arraleh produced sufficient evidence to make out a submissible case on his hostile work environment claim.

-20-

The majority also fails to take into account the discriminatory impact of these attitudes on Arraleh's failure-to-hire claim. Even though Arraleh's coworkers were not his official superiors, their impact on this decision was influential. A direct evidence inquiry is not limited to those officially entrusted with decision-making responsibilities. If a reasonable factfinder can conclude that a third party was closely involved in the decision-making process, then the analysis can extend to those who unofficially influence the decision-making process. *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 641-42 (8th Cir. 2002), *overruled on other grounds in Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

In *Mohr*, this court found a reasonable inference between the decision not to hire Mohr and decisions made by an intermediate supervisor who was not directly responsible for hiring or firing Mohr. The *Mohr* decision relied on the precedent that "[c]ourts [should] look beyond the moment a decision was made in order to determine whether statements or comments made by other managerial employees played a role in the ultimate decisionmaking process." *Id.* at 641 (quoting *Gagnon v. Sprint Corp.*, 284 F.3d 839, 848 (8th Cir. 2002)). Even if the ultimate decision to not hire or to fire was free of discriminatory animus, this court has held that we cannot sterilize a seemingly objective decision when it is the *indirect* product of such animus. *Id.* at 641-42.

As a contract employee, Arraleh's unofficial superiors were his permanent coworkers. Their exacting scrutiny and constant complaints regarding Arraleh led ultimately to the decision not to hire him. As Novak and Waldhauser attested, these complaints appeared motivated by discriminatory animus toward Arraleh. And it is reasonable to assume that given Haigh's testimony, any hope of working alongside his permanent coworkers was stymied by their attitudes toward blacks and Muslims. For the purpose of summary judgment review, the involvement of Arraleh's coworkers in the decision-making process and their alleged comments about blacks

-21-

and Muslims sufficiently establish a specific link between the decision not to hire and the alleged discriminatory animus.

Lastly, Arraleh articulates a case for retaliation that should be presented to a jury. The majority states Arraleh failed to establish a factual question of causation. A plaintiff may use circumstantial evidence to establish a causal inference by showing a temporal proximity between the protected conduct and the adverse action. *EEOC v. Kohler Co.*, 335 F.3d 766, 773-74 (8th Cir. 2003); *see also Smith v. Allied Health Sys.*, 302 F.3d 827, 833-34 (8th Cir. 2002). Here, there were merely three weeks between Arraleh's discrimination complaint and Zurn's decision not to hire him. Inconsistent enforcement of employment standards is also relevant to the retaliation inquiry. *Kohler*, 335 F.3d at 775-76. The majority accepts Arraleh's alleged deficiencies as the true basis for Zurn's decision not to hire Arraleh. However, these deficiencies are in dispute. As noted previously, there is strong evidence showing that Arraleh was unfairly scrutinized by his fellow employees. The record reflects Zurn knew of, yet did nothing to correct, this skewed standard; when Novak and Waldhauser reported it to him, he refused to discuss it with Waldhauser, and yet Zurn never reprimanded Arraleh for this alleged behavior. Finally, Waldhauser gave a positive evaluation of Arraleh's work and noted that many of the county's clients preferred to work with Arraleh. In short, the idea that Arraleh was not permanently hired because of his poor work is, at the very least, suspect and disputed. Rather than allow the district court to be the arbiter of fact in this instance, the material issues of fact in this claim should be decided by a jury.

For these reasons, I would reverse the grant of summary judgment and remand to the district court for further proceedings.

_____