# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2105

_____

Kathy Kelleher

*Plaintiff - Appellant*

v.

Wal-Mart Stores, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: November 5, 2015
Filed: March 31, 2016

_____

Before SMITH, COLLOTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Kathy Kelleher filed this action in the Iowa District Court in and for Dubuque County on December 31, 2013, alleging disability discrimination, failure to continue to accommodate, retaliation, and harassment. Wal-Mart later removed the case to the

United States District Court for the Northern District of Iowa. The district court[1] granted summary judgment in favor of Wal-Mart on all claims. We have jurisdiction pursuant to 28 U.S.C. § 1291 and, finding no error, we affirm.

## I. Background

Kathy Kelleher began working for Wal-Mart in 1995 as a truck unloader for the Dubuque Wal-Mart store. After approximately two years, she switched positions to stocker, working the overnight third shift. Wal-Mart's job description for the stocker position states, among a list of requirements, that "mov[ing] up and down a ladder" is a physical activity "necessary to perform one or more essential functions" of the position. All stockers are subject to assignment in different areas of the store and move from department to department.

In 1997, Kelleher was diagnosed with Multiple Sclerosis (MS). She verbally reported to her work supervisors that her physician had imposed a work restriction of no ladder use. It is undisputed that from 1997 through 2011, Wal-Mart accommodated Kelleher's verbal request. Kelleher also submitted a series of other similar requests throughout that time period. In 2006, Kelleher submitted a formal Request for Accommodation (RFA) to take extra time during her shift to take her medication. Wal-Mart granted the request.

In 2009, Kelleher submitted an RFA seeking an extra fifteen-minute break. Wal-Mart's policy at that time required Kelleher's store to send the RFA to the local Market Human Resources Manager (MHRM) for a decision. The MHRM recommended that the store deny Kelleher's request for lack of proper medical

[1]The Honorable Jon S. Scoles, Chief United States Magistrate Judge for the United States District Court for the Northern District of Iowa, to whom the case was submitted by consent of the parties under 28 U.S.C. § 636(c).

documentation.  The MHRM also noted that because Kelleher's physician indicated that she could not work on ladders, reassignment to a different position not requiring ladder use was recommended.  Despite the MHRM's recommendation, store management continued to accommodate Kelleher by allowing her to remain a stocker and not use ladders.  The store also allowed her the extra fifteen-minute break.

In January 2011, Kelleher requested and was granted FMLA leave for an appendectomy.  Kelleher's physician provided her a return-to-work note listing a 10-pound weight lifting restriction, no pulling of pallets, no climbing of ladders, and no overhead lifting.  The note also states that "[t]hese are permanent/medical restrictions."  Since "mov[ing], lift[ing], [and] carry[ing] . . . merchandise and supplies weighing less than or equal to 50 pounds without assistance," and "pulling" were also necessary physical activities of the stocker position, the Personnel Coordinator at Kelleher's store informed Kelleher that she would be unable to return to her position as a stocker with those permanent work restrictions.  In response, Kelleher contacted her physician, requesting a change to the restrictions.  Kelleher's physician agreed to provide her with a new note, requiring only that she not climb ladders and not work in extreme hot or cold conditions.  Management then allowed Kelleher to return to her stocker position without requiring her to use a ladder.

In June 2011, Kelleher submitted another RFA, seeking a second extra 15-minute break. The store preliminarily granted her request. Wal-Mart's procedure for determining appropriate employee accommodations, however, was centralized in 2010, so this time Kelleher's store was required to submit the RFA to corporate headquarters.  A doctor's certification from Kelleher's physician accompanied her RFA, which stated that Kelleher's major life activities were affected as follows: she (1) could stand for 45 minutes before needing a 3-minute break; (2) could not lift over 10 pounds; (3) could not lift overhead; (4) could not walk over 300 feet; (5) could not climb ladders; and (6) could not work in temperature extremes.  It is unclear from the record whether the restrictions identified were relevant to the request for a second

extra 15-minute break, but it is undisputed that Kelleher did not ask her physician to modify the note to lift any of the additional restrictions.

After Kelleher's June 2011 RFA, her shift manager began assigning her to stock the cereal aisle, whereas previously she had been regularly assigned to stock the domestics and small furniture departments. Kelleher found the top shelves of the cereal aisle difficult to stock without a ladder. Kelleher's manager stated in her deposition that Kelleher was asked to stock the grocery sections of the store because Wal-Mart did not "have [the] staffing" that they used to, and "the priority for the night is always the consumables."

It was not until October 2011 that Accommodations Services Center manager Kirk Hancock, at Wal-Mart's corporate headquarters, reviewed Kelleher's June 2011 RFA and determined that the restrictions from her physician did not allow her to perform the essential functions of her job as a stocker. Hancock sent a letter to Kelleher's store on October 31, explaining his determination and indicating that Kelleher should be placed on unpaid personal leave for up to 90 days while Wal-Mart tried to find a suitable reassignment meeting her work restrictions. It seems that no one received the letter, as Kelleher continued to work as a stocker. On January 21, 2012, Hancock sent another letter stating that Wal-Mart was unable to find a suitable open position for Kelleher. He indicated that she could take FMLA or personal leave and apply for open positions within her work restrictions.[2]

_____

[2]Kelleher asserts that Hancock's conclusion was based on erroneous restrictions from her doctor, because no other limitations should have been presented to him besides the revised restrictions from February 2011 of no ladder use and no working in extreme hot or cold conditions. However, our conclusion is unaffected by whether Hancock relied on the restrictions of no ladder use and no hot and cold temperatures, or a longer list of restrictions, because we base our analysis solely on Kelleher's shorter list, which she does not dispute. Moreover, Kelleher's store management focused solely on Kelleher's restriction of no ladder use, and ignored the overhead lifting and 10 pound weight-lifting restrictions, restrictions Hancock also

-4-

After he received Hancock's second letter, Robert Wallace Harding, Kelleher's store manager, instructed Jeri Barnhart, the store's personnel manager, "to go through the job codes and see what would fall in place for [Kelleher] so we don't have to terminate her. We need to find something that will work for her." Barnhart and Harding determined that the position of overnight cashier would work best.

Kelleher first heard about the search for a new position for her when she was called in to discuss the overnight cashier position. When Harding and Barnhart told her they could not "find another job for [her] at [that] point," Kelleher says she felt pressured to accept the new position.

Wal-Mart's description for "cashier" does not include ladder use as an "essential function" or "physical activity," and the position is less physically strenuous than stocking.[3] The overnight cashier position also included a $.20/hour raise from Kelleher's stocker position. The overnight cashier duties were very similar to the stocking duties Kelleher had performed for fourteen years, but with some additional responsibilities associated with staffing the customer check-out lane. Generally, however, an overnight cashier performs more stocking than cashiering. During the overnight third shift, the Customer Service Manager stays at the front of

---

identified as reasons necessitating Kelleher's reassignment. Had management focused on the longer list of restrictions, Kelleher would have been precluded from the overnight cashier position as well. *See infra* n. 3.

[3]The physical activities "necessary to perform one or more essential functions" of the overnight cashier position include the ability to: (1) visually verify information (often in small print); (2) visually locate merchandise and other objects; (3) read information (often in small print); (4) reach overhead and below the knees, including bending, twisting, pulling, and stooping; (5) move, lift, carry, and place merchandise and supplies weighing less than or equal to 25 lbs without assistance; (6) grasp, turn, and manipulate objects of varying size and weight, requiring fine motor skills and hand-eye coordination; and (7) communicate effectively in person or by using telecommunications equipment.

the store all night cashiering, and only calls an additional cashier (an overnight cashier like Kelleher) to help if the store becomes busy. Otherwise, overnight cashiers stock the store.

Kelleher expressed fear that the new cashier position would be more difficult for her because of her speech and eyesight, and she was nervous that customers would make comments about her. She produced no medical evidence, however, that she could not perform the duties of her new position. After becoming a cashier, Kelleher continued to perform stocking duties within her restriction of no ladder use. Moreover, during the pendency of litigation, Wal-Mart allowed Kelleher to refrain from cashiering while continuing to stock.

Kelleher alleges that a change in her performance reviews indicated retaliatory treatment. She received "exceeds expectations" ratings and accompanying pay raises for her performance reviews from 1998 through 2010. On August 4, 2011, after she had submitted her RFA on June 15, 2011, she received a lower "solid performer" rating and a lesser pay raise. She received a $.40 pay raise rather than a $.50 pay raise. Kelleher's annual "solid performer" rating continued through 2014.

Kelleher also alleges that after she submitted her accommodation request in June 2011, store management began harassing her by forcing her to work alone, giving her assignments that were difficult, rolling their eyes at her and acting exasperated when she walked by, ostracizing her, holding her to a higher standard than other employees, and by giving her twice the workload of other employees. She alleged that management also asked her about the status of completion of her work more often than they asked other employees.

## II. Discussion

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to Kelleher, the non-moving party. Robinson v. Am. Red Cross, 753 F.3d 749, 754 (8th Cir. 2014).

## A.      Disability Discrimination and Failure to Accommodate[4]

Kelleher asserts a failure-to-accommodate claim under the Americans with Disabilities Act (ADA) and the Iowa Civil Rights Act (ICRA). The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." Id. at § 12112(b)(5)(A).

To support her failure to accommodate claim, Kelleher "must establish both a prima facie case of discrimination based on her disability and a failure to accommodate it." Schaffhauser v. United Parcel Serv., Inc., 794 F.3d 899, 905 (8th Cir. 2015). In order for Kelleher to establish a prima facie case of discrimination based on disability, she must show (1) a qualifying disability; (2) qualifications to perform the essential functions of her position with or without reasonable accommodation; and (3) an adverse employment action due to her disability. Norman

---

[4]Kelleher included her disability discrimination claim and her "failure to continue to accommodate" claim as Counts 1 and 2, respectively, in her first amended complaint, but the district court addressed those claims as a single failure to accommodate claim. On appeal, Kelleher also treats them as a single claim, and we will do the same.

v. Union Pac. R.R. Co., 606 F.3d 455, 459 (8th Cir. 2010) (citing Finan v. Good Earth Tools, Inc., 565 F.3d 1076, 1079 (8th Cir. 2009)).[5]

Both parties agree that Kelleher is disabled within the meaning of the ADA. The parties dispute whether Kelleher was qualified for her position, but we need not resolve this disagreement, because we conclude that the third element of the prima facie case—whether Kelleher suffered an adverse employment action—is dispositive. We agree with the district court that Kelleher did not experience an adverse employment action because accepting the cashier position did not "material[ly] change" the "terms or conditions of [her] employment." Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 716 (8th Cir. 2003). An "increased workload that materially changes an employee's duties can constitute an adverse employment action." Sellers v. Deere & Co., 791 F.3d 938, 944 (8th Cir. 2015). But here, Kelleher has conceded that the overnight cashier position is less physically strenuous than stocking, and her acceptance of that position was accompanied by a $.20/hour raise.

A transfer to a new position may be considered an adverse employment action if the plaintiff cannot perform the responsibilities of the new position due to disability. Here, however, Kelleher has failed to offer evidence that she is unable to perform the job of overnight cashier. Kelleher believes she was forced into a new position that she did not want and that she felt would humiliate her. She also asserts that the overnight cashier position included new responsibilities that she felt she could not do. But, as the district court noted, her reasons for her concerns are vague, unsupported by any medical evidence, and ultimately insufficient to establish her claim. While "[t]o be 'adverse' the action need not always involve termination or

---

[5]The same analysis applies for disability discrimination claims brought under Iowa law. See Christensen v. Titan Distrib., Inc., 481 F.3d 1085, 1093 n.3 (8th Cir. 2007). It is therefore unnecessary to discuss separately the parallel claim under the Iowa Civil Rights Act.

even a decrease in benefits or pay . . . not everything that makes an employee unhappy is an actionable adverse action." Sellers, 791 F.3d at 941 (quoting Fenney, 327 F.3d at 717). Kelleher may have been apprehensive about taking on the responsibilities of a new position. But there is no evidence that she was actually subject to harassment or comments by customers as a cashier; that there was any particular job responsibility she was medically unable to perform; or that management ever determined she was unable to fulfill her new responsibilities.

Instead, Kelleher was transferred from her stocker position to an overnight cashier position with almost identical skill requirements, minus ladder use and with the addition of some interaction with customers. We conclude that this change did not amount to an adverse employment action, because "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013).

Because Kelleher failed to show she suffered an underlying adverse employment action, she has not made out a prima facie case of discrimination, and she cannot prove her claim that Wal-Mart failed to accommodate her disability.[6]

---

[6]To the extent Kelleher argues that Wal-Mart should have engaged in the interactive process with regard to her new position, we note that she never formally requested an accommodation after beginning the cashier job. The interactive process "must be initiated by the disabled employee, who must alert [her] employer to the need for an accommodation and provide relevant details of [her] disability." Schaffhauser, 794 F.3d at 906 (citing EEOC v. Convergys Customer Mgmt. Grp., 491 F.3d 790, 795 (8th Cir. 2007)). Kelleher did not initiate that process here.

**B.      Retaliation**

Because Kelleher has not provided any direct evidence of retaliation, the familiar three-step burden-shifting analysis from McDonnell Douglas applies. Hutton v. Maynard, 812 F.3d 679, 684 (8th Cir. 2016) (citation omitted); see also Estate of Harris v. Papa John's Pizza, 679 N.W.2d 673, 678 (Iowa 2004) (ICRA test).

To proceed under the indirect method of proof, Kelleher must initially show that she engaged in statutorily protected conduct, that she suffered an adverse employment action, and that a causal connection exists between the two. Hill, 737 F.3d at 1218. It is undisputed that Kelleher engaged in a statutorily protected activity. The district court ruled, however, that Kelleher had failed to show that her transfer constituted an adverse employment action, and that it necessarily followed that Kelleher could not show a causal connection between the protected activity and an adverse employment action.

An adverse employment action in the retaliation context is similar to an adverse action under the discrimination standard, and "[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." Spears v. Mo. Dept. of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000) (citations omitted). As we have concluded, the transfer to the overnight cashier position was not an adverse employment action. But, in support of her retaliation claim, Kelleher also asserts that after she requested the June RFA, her performance ratings were lowered from "exceeds expectations" to "solid performer."[7] Based on

---

[7]In addition, while Kelleher argues that the change to a cashier position could affect her future career prospects because she "was forced to move from a position she performed successfully to a position she told Wal-Mart she could not perform

-10-

the change in her performance ratings, Kelleher received a $.40 increase in pay rather than a $.50 increase in pay.

With regard to her performance reviews, "[a] poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment," but it is actionable if the "employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Id. at 854. A decrease in a pay raise based solely on a performance review is a "reduction in pay or benefits" that may amount to a material change in an employee's terms and conditions of employment, or an adverse employment action, at the prima facie stage. Id. at 853. This is true regardless of the dollar amount of the reduction. But even assuming Kelleher has met her burden to prove a prima facie case of retaliation, including the causal connection, she must also discredit Wal-Mart's asserted non-retaliatory reasons for her review and show that the circumstances permit drawing a reasonable inference that the real reason for her termination was retaliation. Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005) ("If the prima facie case is met, the burden first shifts to the defendant to produce 'a legitimate, non-retaliatory reason for the action it took against the plaintiff,'" and then to the plaintiff to show the defendant's reason was pretextual and creates a reasonable inference of retaliation.). Evidence of pretext and retaliation "is viewed in light of the employer's justification." Id. at 881 (quoting Smith v. Allen Health Sys., 302 F.3d 827, 834 (8th Cir. 2002).

Wal-Mart asserts that Kelleher's decrease in ratings was a result of timeliness issues that were not resolved, and further provides evidence that the manager who gave Kelleher the reduced rating was not aware that Kelleher had submitted an RFA.

_____

successfully," she offers nothing more in support of this assertion. She does not identify the potential career prospects or explain how any such prospects might be affected by the transfer.

Kelleher does not contest that Wal-Mart has produced a legitimate, non-retaliatory reason for her reviews. Instead, she addresses whether Wal-Mart's reason was pretextual, noting what she considers to be suspicious timing between her request for an accommodation and her first "solid performer" review. Temporal proximity alone is insufficient to show that an employer's proffered reason for action was a pretext for discrimination. Gibson v. Geithner, 776 F.3d 536, 541 (8th Cir. 2015). Since Kelleher does not offer proof beyond timing, she has failed to establish pretext. Moreover, other evidence in the record—which Kelleher does not dispute—showed that management at Kelleher's store wanted to keep her employed and tried to find a suitable position for her. With temporal proximity alone to support her argument for pretext, Kelleher has failed to create a genuine issue for trial on her retaliation claim.

## C.  Harassment or Hostile Work Environment

In order to establish a claim of harassment or hostile work environment, a plaintiff must show: "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1194–95 (8th Cir. 2006); see also Farmland Foods, Inc. v. Dubuque Human Rights Comm'n, 672 N.W.2d 733, 744 (Iowa 2003).

It is clear that Kelleher belongs to a protected group due to her disability. But the harassment standards are "demanding." Arraleh v. Cty. of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. (quotation omitted). "To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive' to affect a term, condition, or

privilege of the plaintiff's employment." Powell v. Yellow Book USA, Inc., 445 F.3d 1074, 1077 (8th Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "[A]nti-discrimination laws do not create a general civility code." Ryan v. Capital Contractors, Inc., 679 F.3d 772, 779 (8th Cir. 2012) (quoting Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 966 (8th Cir. 1999)).

Kelleher herself states that management was "abusive with a lot of people," and she does not identify any discriminatory statements made to her. "[R]andom 'looks'" and eye rolls in Kelleher's direction may be unpleasant to tolerate but, without more, they are not sufficiently severe to affect the terms, conditions, or privileges of Kelleher's employment. They do not, therefore, rise to the level of harassment.

Moreover, Kelleher fails to successfully establish that she faced a hostile work environment.

> A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment. Relevant factors for determining whether conduct rises to the level of harassment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

Pye v. Nu Aire, Inc., 641 F.3d 1011, 1018 (8th Cir. 2011) (internal quotations and citations omitted). While Kelleher alleges that she was held to a higher standard and assigned more difficult tasks, "[e]vidence, not contentions, avoids summary judgment." Reasonover v. St. Louis Cty., Mo., 447 F.3d 569, 578 (8th Cir. 2006). Kelleher offers no examples or evidence of an increased workload beyond stating that she had four pallets to stock one night. Any looks or misconduct were minor, not

physically threatening, and did not interfere with her work performance.  Therefore, Kelleher has failed to establish that she faced a hostile work environment.

### III. Conclusion

We affirm the judgment of the district court.

_____