STEPHANIE M. ROSE, JUDGE UNITED STATES DISTRICT COURT
Plaintiffs J.S.X., C.P.X., and K.N.X. brought this action on behalf of a putative class of individuals at the Boys State Training School ("the School") in Eldora, Iowa. Plaintiffs allege Defendants Jerry Foxhoven, Richard Shults, and Mark Day maintain unconstitutional and illegal treatment *827 practices with respect to the juveniles at the School who have significant mental illnesses. Following the close of discovery, Defendants filed this Motion for Summary Judgment as to all of Plaintiffs' claims. [ECF No. 148]. The parties have not sought oral argument on Defendants' motion, and the Court finds the issues can be resolved without it. See LR 7(c). The motion is fully submitted and ready for decision. As explained below, Defendants' motion is GRANTED in part and DENIED in part.
I. BACKGROUND
The School is a state institution for male juveniles that have been adjudicated delinquent. See Iowa Code § 232.52. The School's focus is on the development and rehabilitation of the juveniles committed there. Juveniles at the School are to be provided programs "which focus[ ] upon appropriate developmental skills, treatment, placements, and rehabilitation." Id. § 233A.1(1). The School's superintendent, who has "charge and custody of the juveniles committed to the [School] ... shall administer the [School] and direct staff in order to provide a positive living experience designed to prepare the juveniles for a productive future." Id. § 233A.2. Older juveniles "who require secure custody and who live at the [School] for an extended period of time" shall receive "a positive living experience." Id. § 233A.4.
According to Defendants, the juveniles committed to the School "are at the top end of the criminality scale for the State of Iowa." [ECF No. 148-1 at 1]. They are committed to the School after "an average of six, eight, or ten failed previous placements." Id. These previous placements vary and include private residential placements and commitments to psychiatric medical institutions for children. Id. at 2. Students committed to the School are typically removed from previous placements because they were "assaultive toward staff or ... other peers, persistent attempts to abscond, [or] persistent attempts to be defiant and resistant to any type of authority." Id. It is only after several failed placements that Iowa juvenile courts consider placement at the School. See id. The typical age of juveniles committed to the School ranges from 15 to 19.6 years of age.[1] [ECF No. 158 ¶ 4].
The School offers health care services to its students, including mental health care services. Plaintiffs assert the students at the School "have a significant need for mental health services." [ECF No. 163 ¶ 4]. They claim that an estimated 90% of the students have a mental health diagnosis prior to arriving at the School; between 75% and 100% of the students have experienced trauma in some form; and over half of the students at the School are on psychotropic medication at any given time. Id. Defendants deny all of this. Id.
Plaintiffs identify numerous ways in which the mental health care at the School allegedly falls below professional standards. After a review of the medical files of thirty-three students, including those of the Plaintiffs, Plaintiffs' expert found the School "failed to conduct comprehensive mental health assessments, failed to complete mental health treatment plans, failed to provide necessary mental health treatment, and failed to provide appropriate medication oversight." [ECF No. 155 at 13]. Although it is not necessary for the purpose of this Order to discuss these alleged failings in detail, they can be summarized as follows. Plaintiffs allege the School has insufficient staff to meet the *828 mental health care needs of the students, including qualified staff to provide basic therapy and mental health crises services. See id. at 13, 15. The School does not provide adequate individual psychotherapy, and, consequently, is over-reliant on psychotropic medication as a primary treatment option. See id. at 14. Plaintiffs also allege the School fails to adequately screen for mental health issues, develop adequate treatment plans, and adopt adequate oversight for the systems that support necessary mental health care. See id. at 13. Defendants contest these conclusions and the standards on which they are based.
At various times, Defendants have been made aware of potential deficiencies with the mental health care services at the School. Defendant Mark Day, the Superintendent of the School, has made various statements concerning the School's lack of adequate resources to meet the mental health care needs of its students. See [ECF No. 163 ¶ 93]. As early as 2015, the School's "long-time psychologist," Dr. Augspurger, informed Day that he needed "additional support to serve the students" at the School. Id. ¶ 94. In 2015, Day and Dr. Heilbrun (an outside consultant) informed Defendant Richard Shults-the Administrator of the Division of Mental Health and Disability Services-of the School's need for additional psychiatric staffing. See id. ¶¶ 102, 104. Defendant Jerry Foxhoven, the Director of Iowa's Department of Human Services, has reviewed various reports criticizing aspects of the School's mental health care services. Id. ¶ 109. The School has recently made additional hires related to these services, but the parties dispute the motivations behind these hires and their impact on the adequacy of the mental health care services offered at the School. See [ECF No. 158 ¶ 24].
Defendants argue the School "is not a secure facility overall," but it does contain one secure building with single occupancy rooms, Corbett Miller Hall ("CMH"). [ECF No. 148-1 at 3]. CMH is a secure residential building with twenty-four individual locked rooms measuring fifty-four square feet. [ECF No. 163 ¶ 114]. The rooms are sparsely furnished, containing only a concrete slab on which can be placed a mattress; a narrow window; a sink; a toilet; and plastic shelving. Id. Within CMH is a wing of twelve such rooms called the Behavioral Stabilization Unit (the "BSU"). The BSU is used as a "segregation unit" for "solitary confinement." Id. ¶ 115.
Defendants claim the BSU is meant to be a "short term intervention," typically lasting one hour or less, which allows students to "de-escalate in a safe and segregated setting." [ECF No. 158 ¶ 28]. However, Plaintiffs assert students are "commonly paced in the BSU for more than [one] hour." [ECF No. 158 ¶ 28]. They claim that, from May 2016 to May 2017, the average time in solitary confinement ranged from 6.7 to 15.5 hours. Id. Defendant Day admitted in a deposition that a student could be held in the BSU "for a series of days." [ECF No. 163 ¶ 131]. The School's BSU policy states that the BSU "will be utilized when the student's behaviors are such that the safety or security of other students or staff is threatened." [ECF No. 159-2 at 185]. However, that policy also allows students to be placed in the BSU for "[d]isciplinary" reasons." Id. at 188. Defendants admit that students can be placed in the BSU for rule infractions. [ECF No. 163 ¶¶ 142-43]. Further undercutting the BSU's purported focus on safety, the policy allows students to be placed in the BSU for arm-wrestling or shadow boxing. See [ECF No. 159-2 at 192]. A teacher at the School testified during a deposition that she was encouraged to send students to the BSU for *829 being disruptive in class. [ECF No. 163 ¶ 150]. Other evidence also suggests the School employs solitary confinement for relatively minor rule infractions. See id. ¶ 151. Plaintiffs allege the School does not provide adequate psychological assessments either before or after students are placed in solitary confinement. Id. ¶ 135.
CMH also houses the "Corbett-Miller program," which Defendants describe as "a residential program for students who have demonstrated a need for additional structure and security." [ECF No. 158 ¶ 28]. However, Plaintiffs highlight that the Corbett-Miller program "simply consists of the twelve cells in the other wing of CMH." [ECF No. 163 ¶ 116]. Students who are extended beyond a placement in the BSU are "staffed" to the Corbett-Miller program. Id. This means that those students live at CMH. Id. There is no material difference between the rooms in the BSU and those used in the Corbett-Miller program. Id. ¶ 117. Defendants admit all of this, with the qualification that the students in the Corbett-Miller program have "more significant out of room privileges" than students in the BSU. Id. ¶ 116. Defendants allege students are staffed at CMH due to actions that pose a safety risk to School students and staff. [ECF No. 158 ¶ 29]. Plaintiffs dispute whether this is always true, highlighting examples of when students were staffed at CMH following non-violent, "attention seeking antics." Id. Plaintiffs claim, and Defendants deny, that students at CMH, whether staffed there or held in the BSU, are denied educational and recreational opportunities available to other students. See id. ¶¶ 19, 28; [ECF No. 163 ¶ 120].
CMH also contains two interior six-by-twelve foot locked isolation cells. One of these rooms is referred to as the "seclusion room," and the other houses the School's mechanical restraint device known as "the wrap." [ECF No. 163 ¶ 125]. The wrap is a fourteen-point restraint system that pins down a student's arms, legs, and chest. Id. ¶ 127. It is a mat on a metal frame with straps made of canvas fabric and Velcro straps. Id. Students placed in the wrap are completely immobilized with straps across their chest, arms, and knees. Id. Defendants imply that the School only employs the wrap when students pose a risk of harm to themselves or others. See [ECF No. 158 ¶¶ 36-39]. However, Plaintiffs claim students have been restrained for "minor behavioral infractions," such as when one student was placed in the wrap for over an hour for refusing to go to the BSU. [ECF No. 163 ¶ 153]. Although the School's policies limit use of the wrap to one hour, Defendants admit that "occasionally" students are kept under restraint for longer periods of time. Id. ¶ 139. The parties also dispute whether students placed in the wrap receive adequate mental health screening before and after its use. Id. ¶ 140.
Plaintiffs J.S.X., C.P.X., and K.N.X. are teenagers who attended the School between 2016 and 2018. C.P.X. appears to still be a student there. Each Plaintiff suffers from various mental health issues and alleges to have received inadequate mental health treatment at the School. Plaintiffs allege they were placed in solitary confinement for excessive periods of time due to either symptoms of their mental illnesses, or as punishment for non-harmful behavior. Plaintiffs also allege they were placed in restraints in lieu of adequate mental health crises services. Additionally, Plaintiffs assert that, while subject to restraints and seclusion due to "behavioral manifestations of their disabilities," they were separated from non-disabled students and excluded from recreational and educational opportunities at the School. [ECF No. 155 at 41].
*830 On behalf of themselves and those similarly situated, Plaintiffs allege causes of action under: (1) the Due Process Clause of the Fourteenth Amendment; (2) the Cruel and Unusual Punishment Clause of the Eighth Amendment; (3) the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); and (4) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("RA"). [ECF No. 1]. Plaintiffs seek injunctive and declaratory relief. Defendants seek summary judgment in their favor on all of Plaintiffs' claims. [ECF No. 148].
II. STANDARD OF REVIEW
Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Paulino v. Chartis Claims, Inc. , 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis , 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby , Inc. , 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson , 477 U.S. at 255, 106 S.Ct. 2505. Even so, at the summary judgment stage, courts must view "the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record." Pedersen v. Bio-Med. Applications of Minn. , 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting Johnson v. Wells Fargo Bank, N.A. , 744 F.3d 539, 541 (8th Cir. 2014) ). To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. Celotex Corp. v. Catrett , 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). But "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324, 106 S.Ct. 2548.
III. ANALYSIS
A. Substantive Due Process and Eighth Amendment Claims
1. Legal standard
Both the Eighth and Fourteenth Amendments impose duties on state officials regarding the safety and well-being of individuals in their custody. The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter , 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).[2] As it concerns conditions of confinement and medical care, a state official violates a prisoner's Eighth Amendment rights when he or she is deliberately indifferent to a substantial risk of serious harm. See Nelson v. Corr. Med. Servs. , 583 F.3d 522, 528 (8th Cir. 2009). A "deliberate indifference" claim thus has an objective and subjective component. Objectively, Plaintiffs must show that they had a serious medical need or there existed a substantial risk to their health or safety. See id. at 529. Then, they must show Defendants subjectively: (1) knew of the serious medical need or substantial health risk; and (2) disregarded it. See id. at 528-29. The subjective element of this test does not grant prison officials license to ignore obvious dangers to inmates. A prison official's knowledge of a "substantial risk is a *831 question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer v. Brennan , 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted); see also Allard v. Baldwin , 779 F.3d 768, 772 (8th Cir. 2015) ("A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." (citations omitted) ).
An individual's Fourteenth Amendment substantive due process rights are implicated "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g. , food, clothing, shelter, medical care, and reasonable safety." DeShaney v. Winnebago Cty. Dept. of Soc. Servs. , 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Although a detainee's rights under the Eighth and Fourteenth Amendments overlap, the Supreme Court of the United States has observed that they are not always concurrently applicable.
Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions .... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.
Ingraham v. Wright , 430 U.S. 651, 671 n.40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Thus, lower courts have generally taken the view that the Eighth Amendment only applies when a detainee has been convicted of a crime. See, e.g., Revels v. Vincenz , 382 F.3d 870, 874 (8th Cir. 2004) ("[B]ecause an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for the purpose of punishment following conviction, the Eighth Amendment does not apply."). The determination as to whether the Eighth or Fourteenth Amendment applies to a detainee is not insignificant-it is generally accepted that the Fourteenth Amendment's due process protections are "more protective" than the protection afforded by the Eighth Amendment. A.J. by L.B. v. Kierst , 56 F.3d 849, 854 (8th Cir. 1995).
Just last year, the United States Court of Appeals for the Seventh Circuit observed that the Supreme Court has not specified "whether state juvenile detention facility conditions should be judged under the Eighth Amendment's Cruel and Unusual Punishment Clause or the Fourteenth Amendment's Due Process Clause." Reed v. Palmer , 906 F.3d 540, 549 (7th Cir. 2018).[3] The court further noted that the Supreme Court has "expressly avoided deciding this question." Id. at 550 (citing *832 Ingraham , 430 U.S. at 669 n.37, 97 S.Ct. 1401 ). In the absence of such guidance, many circuit courts have applied the Due Process Clause when evaluating conditions at juvenile detention centers. See id. (collecting cases from the First, Eighth, Ninth, Tenth, and Eleventh Circuits). In Kierst , the United States Court of Appeals for the Eighth Circuit found the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment, applied to juveniles subject to pretrial detention. 56 F.3d at 854. The court reasoned that it could not "ignore the reality that assessments of juvenile conditions of confinement are necessarily different from those relevant to assessments of adult conditions of confinement." Id. Echoing the Ingraham court's observations about the procedural posture at which the Eighth Amendment attaches, the Eighth Circuit noted that juveniles subject to pretrial detention generally had not been subject to a judicial determination as to probable cause, or were detained on "unverified petitions." Id. However, the court also rested its decision to apply the Due Process Clause on factors unique to the juvenile system, such as the fact that the system's purpose is "rehabilitative, not penal, in nature," and that "juveniles are frequently detained for reasons entirely separate from those associated with adjudication of charges." Id.
In Iowa, juvenile delinquency adjudications are subject to robust procedural safeguards, including a presumption of innocence, a "beyond a reasonable doubt" standard of proof, and the same rules of evidence (with some minor changes) that apply in adult criminal proceedings. See Iowa Code § 232.47. Yet, they are viewed as "special proceedings that serve as an alternative to the criminal prosecution of a child." In re A.K. , 825 N.W.2d 46, 49 (Iowa 2013). Indeed, Iowa law expressly states that "[a]n adjudication or disposition in a [juvenile delinquency proceeding] shall not be deemed a conviction of a crime." Iowa Code § 232.55(1). Moreover, their purpose is non-penal. "The objective of the proceedings is the best interests of the child." In re A.K. , 825 N.W.2d at 49. This objective is further reflected in Iowa statutes governing the School. For example, Iowa law established "a diagnosis and evaluation center" at the School "to provide court-committed male juvenile delinquents a program which focuses upon appropriate developmental skills, treatment, placements, and rehabilitation." Iowa Code § 233A.1. Also, Iowa law mandates that "[t]he [School] shall provide a positive living experience for older juveniles who require secure custody and who live at the state training school for an extended period of time." Id. § 233A.4.
Given the expressly non-penal, non-criminal nature of Iowa juvenile delinquency adjudications and dispositions, the Court finds Plaintiffs' Eighth and Fourteenth Amendment claims more appropriately arise under the Fourteenth Amendment only. Accordingly, the Court will GRANT Defendants' Motion for Summary Judgment as to Plaintiffs' Eighth Amendment claims (Count II).[4]
As to the appropriate standard for reviewing a non-criminal detainee's Fourteenth Amendment due process claim, the Supreme Court has held that such a detainee may establish a Fourteenth Amendment violation by showing that the government action at issue was: (1) intended to punish; (2) lacked legitimate purpose; or (3) objectively, was "not 'rationally related to a legitimate nonpunitive governmental *833 purpose' or that the actions 'appear excessive in relation to that purpose.' " Kingsley v. Hendrickson , --- U.S. ----, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015) (quoting Bell v. Wolfish , 441 U.S. 520, 561, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ). These factors, however, also serve as a defense for the state actor-" 'restrictions on liberty' are permissible so long as they are 'reasonably related to legitimate government objectives and not tantamount to punishment.' " Reed , 906 F.3d at 550 (quoting Youngberg v. Romeo , 457 U.S. 307, 320, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ). "To make this determination, courts 'weigh[ ] the individual's interest in liberty against the State's asserted reasons' for their restraint." Id. (alteration in original) (quoting Youngberg , 457 U.S. at 320, 102 S.Ct. 2452 ).
Alternatively, because the Fourteenth Amendment is considered more protective than the Eighth Amendment, courts have reasoned that the Due Process Clause "implicitly incorporates the cruel and unusual punishments clause standards as a constitutional minimum." Gary H. v. Hegstrom , 831 F.2d 1430, 1432 (9th Cir. 1987). Thus, some courts have reviewed Due Process Clause claims under the Eighth Amendment's "deliberate indifference" standard, reasoning that if the conduct at issue violates the Eighth Amendment, it necessarily violates the Due Process Clause. See Doe v. Washington Cty. , 150 F.3d 920, 922 (8th Cir. 1998) (applying the Eighth Amendment "deliberate indifference" standard to the claim of a pre-trial detainee, reasoning that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner"). Plaintiffs generally ask the Court to take such an approach here and review both their Eighth and Fourteenth Amendment claims under a "deliberate indifference" standard. See [ECF No. 155 at 10-11]. Notwithstanding the dismissal of Plaintiff's Eighth Amendment claims, the Court will take this proposed approach where appropriate.
Plaintiffs have asserted three conditions or practices that they claim violate their rights under the Due Process Clause of the Fourteenth Amendment: (1) Defendants' failure to provide minimally adequate mental health care at the School; (2) the School's use of solitary confinement; and (3) the School's use of restraints. The Court will address of each of these below.
2. Failure to provide minimally adequate mental health care
Applying the Eighth Amendment "deliberate indifference" test, Plaintiffs argue Defendants have violated their rights under the Fourteenth Amendment's Due Process Clause by failing to provide minimally adequate mental health care at the School. Thus, they argue this failure created a substantial risk to their health or safety, and that Defendants were aware of-and disregarded-that risk. See Nelson , 583 F.3d at 528-29.
Defendants stress, "[t]he Constitution sets a floor of minimum standards-it does not mandate optimal care." [ECF No. 148-1 at 6]. The Eighth Circuit has held that, although individuals who have been involuntarily, civilly committed have a "substantive due process right to reasonably safe custodial conditions," they do not have a "broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." Elizabeth M. v. Montenez , 458 F.3d 779, 788 (8th Cir. 2006). In the context of prison conditions, the Eighth Circuit has held that "deliberate indifference to medical needs amounts to an Eighth Amendment violation ... if those needs are 'serious.' " Dulany v. Carnahan , 132 F.3d 1234, 1239 (8th Cir. 1997). Defendants correctly observe that " 'unless prison officials [know] that the condition create[s]
*834 an excessive risk to the inmate's health and then fail[ ] to act on that knowledge' ... inmates have no constitutional right to receive a particular or requested course of treatment." Id. (citation omitted).
Although it is not clear the extent to which the civil commitment authorities apply to the present case, the Court agrees with Defendants' broad proposition-Plaintiffs have no constitutional right to optimal mental health care. However, Plaintiffs argue only that Defendants' have failed to provide "minimally adequate" mental health care at the School. See, e.g. , [ECF No. 155 at 12]. Montenez and Dulany indicate that the minimal adequacy of the mental health care must be measured in terms of the risk that care poses to Plaintiffs' health and safety. Plaintiffs appear to acknowledge this and have tailored their arguments accordingly.
Plaintiffs submitted evidence in the form of expert reports, which support a finding that the mental health care at the School was inadequate based on "well-accepted professional standards." [ECF No. 155 at 13]; see generally [ECF No. 159-3 at 7, 124]. The alleged failings touch on various aspects of the mental health care at the School, including poor oversight of the mental health care systems; staffing deficiencies; inadequate access to individual psychotherapy (and, relatedly, the over-reliance on psychotropic medication); inadequate crises services; and inadequate procedures for screenings and assessments, developing treatment plans, and the administration of psychotropic drugs. See generally [ECF No. 163 ¶¶ 1-83]. Defendants strongly disagree, often based on the findings of their own expert. See generally id. The parties similarly disagree as to whether these alleged failings created a substantial risk of harm to Plaintiffs. See generally id. ¶¶ 84-89. However, viewing the facts in the light most favorable to Plaintiffs, the Court finds they have shown there are genuine factual disputes as to whether the mental health care at the School was inadequate such that it created a serious risk of harm to Plaintiffs. Such deficiencies, if they can be established, are actionable. See Goff v. Harper , No. 4-90-CV-50365, 1997 WL 34715292, *40-41 (S.D. Iowa June 5, 1997) (finding that inadequate mental health care at a prison violated the Eighth Amendment when failures included inadequate procedures for screening inmates for mental health issues, failure to provide individual treatment plans for inmates with mental health issues, and providing inadequate access to trained mental health professionals).
As to the subjective prong of the deliberate indifference test, Defendants admit they were aware of various deficiencies with the mental health care at the School. See, e.g. , [ECF No. 163 ¶¶ 93-95, 102-03, 108-113]. Moreover, the parties dispute whether Defendants acted appropriately based on that knowledge. See, e.g., id. at ¶¶ 100, 106, 108, 112. The Court finds there are genuine disputes as to Defendants' knowledge regarding the deficiencies of the School's mental health care services, whether Defendants were aware of the risks caused by those deficiencies, and whether Defendants' actions-or failure to act-show a disregard of those risks.
3. Use of solitary confinement and restraints
Plaintiffs allege Defendants implemented a practice and policy of subjecting children with significant mental illnesses at the School to solitary confinement and restraints as a form of punishment. They assert that "[t]he School makes excessive and unnecessary use of these extreme punishments where they are wholly unnecessary for the safety of the child or others, *835 without regard to the child's mental illness or disability." [ECF No. 33 ¶ 141]. Plaintiffs can establish a violation of the Due Process Clause if they can show that the School employs these tactics with the intent to punish. See Kingsley , 135 S.Ct. at 2473. The record contains evidence to that end, and, indeed, Defendants admit that seclusion and restraints are used to "assign[ ] consequences ... for misconduct" in the School's "overall behavioral management system." [ECF No. 148-1 at 9]. Defendants add that students "have an alternative means to exercise their right of liberty-following the rules." Id. at 10. The record also shows Defendants knew of the School's use of solitary confinement as a form of punishment. See [ECF No. 163 ¶ 143].
Defendants nevertheless assert that isolation and restraint "are directly related to safety and maintaining institutional order." [ECF No. 148-1 at 9]. At best, there remains a genuine dispute as to why these measures are used at the School. Therefore, summary judgment is inappropriate as to Plaintiffs' Fourteenth Amendment due process claims.[5]
B. ADA and RA Claims
Plaintiffs assert Defendants violated their rights under the ADA and RA, when "[a]s a result of behavioral manifestations of their disabilities, [Plaintiffs] [were] subject to restraints and seclusion, where they [were] separated from other youth without disabilities, and excluded from recreation and schooling." [ECF No. 155 at 41].
"Title II of the ADA, 42 U.S.C. § 12131 et seq. , prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity." Randolph v. Rodgers , 170 F.3d 850, 857 (8th Cir. 1999). A "qualified individual with a disability" is defined as "an individual with a disability who ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The RA is "similar in substance" to the ADA and "provides that no otherwise qualified *836 individual with a disability shall be 'excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' " Randolph , 170 F.3d at 857-58 (quoting 29 U.S.C. § 794(a) ). "Program or activity" is broadly defined under the RA such that it effectively covers the entirety of the recipient's operations, rather than the specific function for which federal funding is received. See 29 U.S.C. § 794(b) (defining "program or activity," in relevant part, as "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance"). "[W]ith the exception of the RA's federal funding requirement, "cases interpreting either [the ADA or the RA] are applicable and interchangeable.' " Randolph , 170 F.3d at 858 (citation omitted).
To state a prima facie case under the ADA or the RA, "a plaintiff must show: 1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability." Id. For RA claims specifically, a plaintiff must also show "the program or activity from which he is excluded receives federal financial assistance." Id. "As an affirmative defense, a defendant may demonstrate that the requested accommodation would constitute an undue burden." Id.
1. Defined disability
Defendants argue Plaintiffs "have not identified their disability, but merely asserted that each has a disability." [ECF No. 148-1 at 25]. This assertion ignores Plaintiffs' descriptions of their specific mental illnesses in their Complaint, and Defendants' subsequent admissions that Plaintiffs suffer from various mental health conditions. See [ECF Nos. 33 ¶¶ 12, 26, 40; 163-1 ¶¶ 1, 15, 23]. The ADA and RA apply to persons with a disability, which means a "physical or mental impairment that substantially limits one or more of the major life activities of such individual," or "record of such an impairment," or "being regarded as having such an impairment." 28 C.F.R. § 35.108 (physical or mental impairment includes "[a]ny mental or psychological disorder, such as ... emotional or mental illness"). The record indicates Plaintiffs are qualified individuals with disabilities, because, for instance, they suffer from covered mental illnesses that interfere with at least one major life activity, such as "learning," "concentrating," "thinking," "communicating," "sleeping," and "interacting with others." 28 C.F.R. § 35.108(c)(1)(i) ; see also [ECF No. 163 ¶¶ 69, 87].
2. Qualifies for the benefit and exclusion from the benefit because of disability
The Court will consider the second and third elements of Plaintiffs' prima facie case together, namely, whether Plaintiffs qualified for the benefits in question but were excluded from them because of discrimination based on their disability. The record contains evidence that Plaintiffs were denied educational opportunities, available to other students without disabilities, while held in isolation at CMH. See [ECF Nos. 158 ¶ 19; 163 ¶ 120]. Defendants dispute this, arguing that students staffed at CMH have out-of-room privileges that include "time out to attend school and recreate." [ECF No. 163 ¶¶ 116, 119]. This type of factual dispute makes summary judgment on this issue inappropriate.
As to the reasons for any exclusion, Defendants argue Plaintiffs were subject to restraint and isolation-and thus separated from non-disabled youth and excluded *837 from recreation and schooling-because they "posed a direct threat to others." [ECF No. 148-1 at 27]. Relatedly, they argue that "[s]tudents are served in the most integrated setting possible given each student's behavior; less restrictive settings are not always appropriate." Id. at 29.
Defendants are correct that "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities." 28 C.F.R. § 35.130(h). "However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." Id. Defendants allege each Plaintiff posed a direct threat to others on various occasions. [ECF No. 148-1 at 27-28]. However, Plaintiffs assert-and Defendants dispute-that evidence in the record shows Defendants routinely segregated mentally ill students based on "safe behaviors that are manifestations of mental illnesses and which do not pose an objective safety risk." [ECF No. 155 at 43]; see also [ECF No. 163 ¶¶ 124, 143, 145-51]. The Court finds there is a genuine factual dispute as to whether Plaintiffs were isolated based on legitimate safety concerns, or instead based on manifestations of their disabilities that neither implicated those concerns nor warranted the restrictive measures utilized by the School.
Defendants also argue Plaintiffs' ADA and RA claims fail because Plaintiffs have failed to ask for a reasonable accommodation. [ECF No. 148-1 at 28]. They cite no authority that supports their view that this is a requirement of ADA and RA claims.[6] Further, the United States District Court for the District of Columbia recently considered and rejected such an argument.
[N]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned. Quite to the contrary, as explained above, [the RA and ADA] mandate that entities act affirmatively to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services. See, e.g. , 42 U.S.C. § 12131(2) ; 28 C.F.R. § 35.150(a) ; 28 C.F.R. § 35.150. This affirmative duty is seemingly at its apex in the context of a prison facility, in light of the uneven power dynamic between prison officials and inmates that inherently and appropriately exists, and also the fact that departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all.
Pierce v. District of Columbia , 128 F.Supp.3d 250, 269 (D.D.C. 2015). This reasoning is persuasive but has its limits. In Randolph , the defendants argued the plaintiff-inmate failed to make a timely request for a sign language interpreter. See 170 F.3d at 858. However, the record showed that the plaintiff requested an interpreter on a prior occasion, but the defendants refused to discuss it with him. See id. The Eighth Circuit reasoned, "[w]hile it is true that public entities are not required to guess at what accommodations they should provide, the requirement does not *838 narrow the ADA or RA so much that the [defendants] may claim [the plaintiff] failed to request an accommodation when it declined to discuss the issue with him." Id. at 858-59. Thus, although Plaintiffs need not have made an accommodation request in order to make out a prima facie claim under the ADA and RA, the circumstances must have been such that Defendants were aware of Plaintiffs' disabilities and their need for an accommodation. See Robertson v. Las Animas Cty. Sheriff's Dep't , 500 F.3d 1185, 1197-98 (10th Cir. 2007) ("[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation.").
As already discussed, there are numerous disputed facts regarding Plaintiffs' mental illnesses and the School's use of isolation and restraint in response to behavior arising from their disabilities. Based on the present record, the Court cannot determine as a matter of law whether Defendants knew their practices concerning these measures were inappropriate and should have been modified.
3. Receipt of public funds
Defendants argue Plaintiffs cannot establish the public funds element of their RA claim because the School only receives federal funding under the National School Lunch Program, which is unrelated to Plaintiffs' claims. However, the Court has already noted that "program or activity" is broadly defined in the RA so that it applies to the entirety of the recipient's operations, rather than the specific function for which federal funding is received. See 29 U.S.C. § 794(b) (defining "program or activity," in relevant part, as "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance").
Defendants also argue that applying the RA in this case violates the Constitution's Spending Clause because standards of mental health treatment and limits on the use of isolation and restraints are not reasonably related to the federal interests promoted by the National School Lunch Program. See [ECF No. 148-1 at 31-32]. At least three circuit courts have rejected similar arguments. See Miller v. Tx. Tech Univ. Health Scis. Ctr. , 421 F.3d 342, 349 (5th Cir. 2005) ; Lovell v. Chandler , 303 F.3d 1039, 1051 (9th Cir. 2002) ; Koslow v. Pennsylvania , 302 F.3d 161, 175-76 (3d Cir. 2002). Accordingly, the Court rejects Defendants' Spending Clause argument.
4. Undue burden
Defendants do not expressly argue that accommodating Plaintiffs' disabilities would constitute an undue burden. However, even if they had, the Court finds this type of highly factualized inquiry cannot be determined as a matter of law based on the record presently before the Court.
C. Eleventh Amendment Defense
Defendants argued for the first time in their reply brief that Plaintiffs' claims must be dismissed because "the sweeping relief sought by Plaintiffs' counsel would require a significant infusion of [state] resources" in violation of the Eleventh Amendment." [ECF No. 162 at 4]. The Court disagrees. Under the Ex parte Young exception to the Eleventh Amendment's grant of sovereign immunity to the states, the Eleventh Amendment does not bar a suit that "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Va. Office for Prot. & Advocacy v. Stewart , 563 U.S. 247, 268, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2001) (citation omitted). Both conditions are established here. Plaintiffs assert claims for violations of the ADA, RA, and the Eighth and Fourteenth Amendments to the Constitution. They *839 seek no retrospective relief or money damages. Rather, they seek: (1) declaratory relief regarding the unconstitutional and unlawful nature of Defendants' course of conduct; (2) injunctive relief to prohibit Defendants' unconstitutional conduct going forward; (3) the appointment of a monitor to oversee implementation of this injunctive relief; and (4) attorney's fees.[7] This relief is focused on correcting the ongoing statutory and constitutional violations going forward, and is properly viewed as prospective.
That some of this relief will impose ancillary costs on the state of Iowa does not render it unconstitutional. Such costs are permissible when they are "the necessary result of compliance with decrees which by their terms [are] prospective in nature." Edelman v. Jordan , 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the" Ex parte Young exception. Id. Accordingly, the Court rejects Defendants' Eleventh Amendment defense.
IV. CONCLUSION
For the foregoing reason, Defendants' Motion for Summary Judgment, [ECF No. 148], is GRANTED as to Count II. It is DENIED as to all other counts.
IT IS SO ORDERED.

In certain circumstances, juveniles committed to the School can remain there past their eighteenth birthday. See Iowa Code 232.53(4).

The Eighth Amendment applies to the states through the Fourteenth Amendment's Due Process Clause. Wilson , 501 U.S. at 296-97, 111 S.Ct. 2321.

Reed involved claims under the Eighth and Fourteenth Amendments brought by former students of the Iowa Girls State Training School in Toledo, Iowa. See Reed , 906 F.3d at 544. That school, which was the female equivalent of the school at issue here, was closed in January 2014. Id. The plaintiffs in Reed were students at the Iowa school who, when it closed, were transferred to a similar school in Wisconsin. See id. Reed concerned conditions at the Wisconsin school and included claims that the school staff used excessive force and subjected students to prolonged periods of solitary confinement. See id. at 544-45.

This is of little practical consequence to Plaintiffs, who have based their Eighth Amendment and Fourteenth Amendment claims on the same alleged wrongs. See [ECF No. 33 ¶¶ 204, 209].

Defendants argue Plaintiffs cannot establish Defendants' individual liability because "none of Defendants are directly responsible for providing [mental health] treatment." [ECF No. 148-1 at 24]. This mischaracterizes Plaintiffs' claims. Plaintiffs' claims concern broad, systematic faults with the School's mental health treatment program and its policies governing the use of seclusion and restraints. Their claims implicate administrative decisions related to funding, hiring, and the overall design of the School's programs. The record indicates Defendants held positions granting them responsibility over the School and the implementation of its programs. See [ECF No. 163 ¶¶ 92, 101, 107]. There is evidence, albeit disputed, that Defendants were aware of the dangers accompanying these alleged faults, and they failed to act properly. If Plaintiffs can establish their view of the facts, the Court could find Defendants personally liable. See Montenez , 458 F.3d at 786 ("[W]hen the claim is, as here, against the institution's supervisors for inadequate safety policies, plaintiff must prove (i) that an employee violated her due process right to safety, (ii) that institutional policies led to the violation, and (iii) that the polices were adopted with deliberate indifference to their known or obvious consequences."); Goodson v. City of Atlanta , 763 F.2d 1381, 1389 (11th Cir. 1985) (finding that jail supervisor could be held personally liable, absent his personal participation in the acts in question, due to "his failure (a) to train subordinates and to establish procedures for protection of constitutional rights and (b) to take action against violations of which he had notice"); McCann v. Coughlin , 698 F.2d 112, 125 (2d Cir. 1983) (finding prison officials had requisite personal involvement in the unlawful practices of a prison "Adjustment Committee," where they controlled the prison, had, at least, constructive knowledge of the unlawful practices, and failed to act on the basis of their knowledge).

Defendants cite only Kelleher v. Wal-Mart Stores , 817 F.3d 624 (8th Cir. 2016), for the proposition that "[p]roposing alternative solutions is ... a legally required an [sic] element of proof of [sic] viable reasonable accommodation to Plaintiffs' failure to accommodate claim." [ECF No. 148-1 at 29]. Such a requirement is not set out in Kelleher. Instead, Kelleher states, uncontroversially, that "[t]o support her failure to accommodate claim, [the plaintiff] 'must establish both a prima facie case of discrimination based on her disability and a failure to accommodate it.' " 817 F.3d at 631 (citation omitted).

Attorney's fees are ancillary relief that is not subject to Eleventh Amendment sovereign immunity. See Jensen v. Clarke , 94 F.3d 1191, 1201-02 (8th Cir. 1996).